**CHURCH OF SCIENTOLOGY INTERNATIONAL, a corporation; Religious Technology Center, a corporation; and Scientology Missions International, a corporation, Plaintiffs-Appellants,**

v.

**The ELMIRA MISSION OF THE CHURCH OF SCIENTOLOGY, a corporation, a/k/a Church of Scientology, Mission of Elmira, a/k/a Dianetics Center, a/k/a Scientology Elmira, a/k/a Center for Creative Learning; Harry Palmer, an individual; and Avra Honey-Smith, an individual, Defendants-Appellees.**

No. 537, Docket 85–7693.

United States Court of Appeals, Second Circuit.

Argued Dec. 6, 1985.

Decided June 23, 1986.

Michael C. Elmer, Washington, D.C. (Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, D.C., Paul J. Yesawich, III, Kevin J. Arquit, Harris, Beach, Wilcox, Rubin and Levey, Rochester, N.Y., Thomas M. Small, Fulwider, Patton, Rieber, Lee & Utecht, Los Angeles, Cal., of counsel), for plaintiffs-appellants.

Mark S. Nunn, Rochester, N.Y. (Weidman & Jordan, Rochester, N.Y., of counsel), for defendants-appellees.

Before LUMBARD, CARDAMONE and WINTER, Circuit Judges.

CARDAMONE, Circuit Judge:

This appeal is from a denial of a preliminary injunction. 614 F.Supp. 500. Appellants, who had licensed appellees to use their registered trademarks, later terminated the appellees' authority. When the former licensees continued their now unauthorized use, appellants brought a Lanham Act suit and sought a preliminary injunction. The issue in this case is whether in the licensor/licensee context irreparable harm automatically flows from a finding of unlawful use and consumer confusion. Common sense plainly suggests that when a terminated franchisee's continued use of its former franchisor's trademarks results in demonstrated consumer confusion, the franchisor has been irreparably harmed. Hence, we reverse the order denying a preliminary injunction and direct its issuance.

I

The facts are largely undisputed. Plaintiffs-appellants are three California corporations: Church of Scientology International (CSI) is the "Mother Church" for its 33 churches and 80 Missions in the United States; Scientology Missions International (SMI) is the head of the Missions; and Religious Technology Center (RTC) is the owner and protector of the trademarks and service marks of the religion of Scientology. Defendants-appellees are Harry Palmer and Avra Honey-Smith, residents of Elmira, New York, and the Elmira Mission of the Church of Scientology, a New York corporation. L. Ron Hubbard was the founder of and—until his recent death on January 24, 1986—reputedly controlled the Church of Scientology. Defendant Harry Palmer has since 1972 operated an authorized Scientology Mission in Elmira. In 1975 the Elmira Mission incorporated under the name "the Elmira Mission of the Church of Scientology" and the following year it was granted a license to use all Scientology trademarks and service marks held and controlled by Mr. Hubbard. In exchange for that right, defendants were to pay ten percent of its income as a tithe to the Mission Office. Six years later Mr. Hubbard allegedly assigned his rights in all Scientology trademarks to RTC, which had been organized especially to own and protect all Scientology trademarks.

RTC immediately increased the licensing fee. On September 9, 1982 defendants signed a new License Agreement requiring them to pay 15 percent of their income as well as additional fees to RTC in order to continue using the Scientology trademarks. The following day defendants renounced the agreement, but continued to use the marks and to pay the former ten percent tithe. When in November 1984 defendants ceased making any payments to the Mission Office, appellants promptly moved for arbitration provided for under the agreement. Upon defendants' refusal to appear or participate, a default judgment was rendered by the arbitrator against them on November 14, 1984. As further efforts to resolve the dispute were unsuccessful, appellants on March 25, 1985 filed a complaint in the United States District Court for the Western District of New York (Telesca, J.) and sought a preliminary injunction. Plaintiffs' complaint broadly alleges claims for relief under the Trademark Act of 1946 (the Lanham Act), 15 U.S.C. §§ 1051–1127 (1982), specifically §§ 1114(1) and 1125(a), and pendent actions under New York laws relating to trade and service marks, trade names, dilution, unfair practices and breach of contract. The application for a preliminary injunction, limited to the Lanham Act claims, seeks to enjoin defendants from continuing to use appellants' marks pending the trial of the action.

The district court denied the motion on August 1, 1985. The court noted that a preliminary injunction may be granted only if the plaintiff makes a showing of irreparable harm. It concluded that the presumption of irreparable harm which arises from a demonstration by a trademark plaintiff of a likelihood of confusion is rebuttable. The district judge then found plaintiffs had not sufficiently shown that defendants' use of the trademarks would in any way damage the business or reputation of the Church of Scientology. The district court further found inconsistencies in our traditional rule that a trademark plaintiff almost inevitably satisfies the required irreparable harm prong upon showing that the use of his mark or name by someone else in connection with the sale or offer of goods and/or services nearly identical to those of the trademark-owner is likely to cause consumer confusion. The district court denied the preliminary injunction having found irreparable harm absent. It did not therefore reach or consider the likelihood of success prong. This expedited appeal followed.

## II

### A. *Irreparable Harm*

#### 1. *Traditional Rules*

■ An appellate court may reverse the grant or denial of a preliminary injunction only when the district court has abused its discretion, by misinterpreting the law, by committing a clear error of fact, or by erroneously fashioning the substance or form of the injunction. *Coca-Cola v. Tropicana Products, Inc.,* 690 F.2d 312, 315–16 (2d Cir.1982). A preliminary injunction should be granted where the moving party demonstrates (1) irreparable harm and (2) either (a) a probability of success on the merits or (b) sufficiently serious questions going to the merits to make them fair grounds for litigation and a balance of hardships tipping decidedly in the moving party's favor. *Id.* at 314–15; *Power Test Petroleum Distributors v. Calcu Gas,* 754 F.2d 91, 95 (2d Cir.1985).

■ For many years we have consistently held that a preliminary injunction should usually issue when the use of a mark creates a likelihood of confusion in the consumers' minds as to the ownership or sponsorship of a product. Our cases clearly say that establishing a high probability of confusion as to sponsorship almost inevitably establishes irreparable harm. Proof of such confusion also serves as additional evidence with respect to the separate finding that must be made of plaintiff's likelihood of success on the merits. *Standard & Poor's Corp. Inc. v. Commodity Exchange Inc.,* 683 F.2d 704, 708 (2d Cir.1982); *see, e.g., Matter of Vuitton et Fils*

*S.A.*, 606 F.2d 1, 4 (2d Cir.1979) (per curiam); *Omega Importing Corp. v. Petri-Kine Camera Company*, 451 F.2d 1190, 1195 (2d Cir.1971). These rules govern in the ordinary case. The implication of the phrase that irreparable harm "almost inevitably" follows from likelihood of confusion leaves the door slightly ajar perhaps for those few cases in other trademark contexts where irreparable harm does not follow. The district court may have thought that this was one of those rare cases. But in a licensor/licensee case the reasons for issuing a preliminary injunction for trademark infringement are more compelling than in the ordinary case. When in the licensing context unlawful use and consumer confusion have been demonstrated, a finding of irreparable harm is automatic.

■ Appellants licensed their marks to defendants and then, according to the undisputed facts in the record, terminated defendants' authority to use them under the terms of a written contract between the parties. As holders of numerous federally registered trademarks and service marks, appellants are entitled to a strong presumption of their marks' validity and of ownership. *See American Home Products v. Johnson Chemical Co.*, 589 F.2d 103, 107 (2d Cir.1978). Moreover, when defendants obtained a license to use the marks—first in the mid-1970s from L. Ron Hubbard and later in 1982 from RTC—they acknowledged the marks' validity and appellants' superior rights to them.

Such acknowledgment strongly reinforces appellants' claim that infringement would be caused if defendants, as former licensees, continued their use of the marks after their authorization to do so had been terminated. *Burger King Corp. v. Mason*, 710 F.2d 1480, 1492–93 (11th Cir.1983), *cert. denied*, 465 U.S. 1102, 104 S.Ct. 1599, 80 L.Ed.2d 130 (1984). The record reveals that defendants continue their unlawful use of the identical marks registered to appellants. Appellants clearly were and continue to be interested in the use of their marks in Elmira, since it was the Scientology Church itself which first licensed defendants as an authorized Scientology Mission, thereby evincing an interest in the Elmira market. In light of these undisputed facts, the district court found that consumer confusion would be caused by defendants' use of appellants' marks. Although the district court implied that appellants would probably succeed on the merits, it made no explicit finding on this point.

### 2. *Rule Applied By The District Court*

In finding that no irreparable harm would be caused to appellants if the injunction were denied, the district court read our cases as creating an inconsistent pattern. This conclusion was bottomed on its interpretation of two recent decisions, *Citibank, N.A. v. Citytrust*, 756 F.2d 273 (2d Cir. 1985), and *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42 (2d Cir. 1983). From its reading of those cases, the district court held that a finding of irreparable harm no longer automatically follows from a finding that the defendant is using plaintiffs' marks and that consumers are likely to be confused by that use. Rather, it believed a court must focus on the *type* of consumer confusion likely to be caused to determine whether the irreparable harm prong has been satisfied before a preliminary injunction may issue. It held that the confusion caused by the fact that consumers were led to believe they were dealing with an authorized or licensed distributor would not be enough to find irreparable injury, unless specific economic or reputational injury could be demonstrated.

■ These two cases did not create an exception to our traditional rule that a finding of irreparable harm follows from a trademark plaintiff's showing of infringing use and likelihood of confusion. *Citibank* essentially stands for the proposition that absent a likelihood of confusion between two banks operating for years in the same market with the similar names of "Citytrust" and "Citicorp", and because of plaintiff's substantial delay in seeking an injunction, irreparable harm did not follow. *Id.* at 277. Again, in *Bell & Howell*, we noted that: "On the basis of the present record, irreparable injury may well not be present

herein since there would appear to be little confusion, if any, as to the origin of the goods...." 719 F.2d at 46. These cases acknowledge the cornerstone of the rule governing issuance of a preliminary injunction, that is to say, there must first be established an infringing use and a probability of confusion as to the ownership or sponsorship of a product.

In a recent case discussing the standards for granting preliminary injunctive relief, we reiterated the traditional rule that irreparable injury may be found where " 'there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question.' " *Joseph Scott Co. v. Scott Swimming Pools, Inc.*, 764 F.2d 62, 66 (2d Cir.1985) (quoting *McGregor-Doniger, Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1130 (2d Cir.1979)). The district court's misperception of our holdings caused it also to ignore the fact that a licensor's plea for injunctive relief is stronger than the ordinary trademark plaintiff's and—because of the necessity of licensor control—irreparable harm *always* flows from unlawful use and confusion. Since Palmer continues to teach by the tenets of the Scientology religion, as he had while an authorized licensee, the trial court found that defendants would not damage the economic value of the goodwill and reputation associated with appellants' mark, and that the courses and services offered by the Elmira Mission would be in no way inferior to, or even different from, those being provided by authorized missions and churches.

### 3. *Rule in Trademark Infringement Suits*

█ The unauthorized use of a mark by a former licensee invariably threatens injury to the economic value of the goodwill and reputation associated with a licensor's mark. As a consequence, a licensor who establishes a likelihood of confusion as to product source in a trademark infringement suit simultaneously demonstrates the requisite irreparable harm essential to obtaining a preliminary injunction.

In *Power Test Petroleum Distributors v. Calcu Gas*, 754 F.2d at 95, we said that irreparable harm exists in a trademark case when the party seeking the preliminary injunction "shows that it will lose control over the reputation of its trademark pending trial." (Citing 2 McCarthy, *Trademarks and Unfair Competition* § 30:15 (2d ed. 1984)). Control of the trademark is crucial in the licensing context because a licensor who fails to monitor its mark risks a later determination that it has been abandoned. *Id.* at 97. " 'If a trademark owner allows licensees to depart from its quality [or other] standards, the public will be misled, and the trademark will cease to have utility as an informational device.' " *Id.* (quoting *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 380 (5th Cir.1977)).

A trademark licensor has a particular interest in controlling the use of its mark by its licensees in order to preserve the mark's quality and its continued vitality. The Scientology Church, for example, has always believed it critical to monitor the services provided by Palmer as a means of protecting its marks, and to dictate the standards by which Palmer preaches the Scientology faith. The 1982 license agreement gave RTC the right continuously to monitor and control Scientology's marks. Defendants themselves acknowledged the existence of licensor control in the September 9, 1982 agreement they entered into with appellants. That agreement explicitly provided:

(d) [appellants] shall have the right to monitor all operations of MISSION with respect to the Marks, inspect all books, records and facilities pertaining to use of the Marks and receive sample specimens and summaries of literature, publications and product, using the Marks in reasonable numbers and with reasonable frequency to insure compliance with all standards, specifications and guidelines.

█ Thus, plaintiffs did not need to prove that defendants had departed from the tenets of the religion to monitor their activities. The ability at any time to insure

compliance with the agreement and to control defendants' activities was an integral part of the contract. Denying a preliminary injunction in this case—where the district court found a likelihood of confusion—puts the Church's reputation beyond its own control. And, it is that loss of control which is the very thing that constitutes irreparable harm in the licensing context.

■ To support its denial of injunctive relief, the district court stated that appellants had not established that defendants had *in fact* reduced the reputation associated with the marks. On the contrary, without a preliminary injunction, appellants will be unable to control the use of their mark by unauthorized licensees; the mere possibility that defendants could during the interval until trial depart from the teachings of the Church is sufficient to warrant the issuance of a preliminary injunction. *See Grand Lodge, Etc. v. Eureka Lodge No. 5, Etc.,* 114 F.2d 46, 48 (2d Cir.), *cert. denied,* 311 U.S. 709, 61 S.Ct. 319, 85 L.Ed. 461 (1940) (to allow a former "Elk" Lodge that had seceded from the general organization to continue using the name would "subject plaintiff in the public mind to responsibility for the action of a group over which it has no further control."). In the eyes of the Scientology Church, Palmer and the Elmira Mission he operates have seceded from the "Mother" Church. As such, they can no longer be relied upon to be true to its teachings, nor are they subject to its control.

In *National Bd. of Y.M.C.A. v. Flint Y.M.C.A.,* 764 F.2d 199, 201 (6th Cir.1985), it was precisely because the National YMCA organization had acquiesced in the use of its marks by unaffiliated or suspended local YMCA organizations that the court refused to issue a preliminary injunction. The initial showing of acquiescence in the use of the mark by former affiliates and lack of competition in products or services precluded a finding of confusion or the concomitant likelihood of success on the merits. *Id.* at 201. Hence, once a trademark owner loses control of its mark by failing zealously to watch over its use by

others—or by not objecting to its unauthorized use—the reputation associated with the mark is reduced. Here, there is no evidence that appellants as licensors acquiesced in defendants' unauthorized use. The evidence is the opposite. Thus, allowing defendants the opportunity to reduce the marks' reputational value and goodwill by its continued unauthorized use constitutes the irreparable harm that is requisite to the issuance of the preliminary injunction.

Finally, the public interest is especially served by issuing a preliminary injunction against a former licensee as the licensee's status increases the probability of consumer confusion. A licensee or franchisee who once possessed authorization to use the trademarks of its licensor or franchisor becomes associated in the public's mind with the trademark holder. When such party, as defendants here, loses its authorization yet continues to use the mark, the potential for consumer confusion is greater than in the case of a random infringer. Consumers have already associated some significant source identification with the licensor. In this way the use of a mark by a former licensee confuses and defrauds the public. *Burger King Corp. v. Mason,* 710 F.2d at 1493; *United States Jaycees v. Philadelphia Jaycees,* 639 F.2d 134 (3d Cir.1981); *Professional Golfers Ass'n v. Bankers Life & Casualty Co.,* 514 F.2d 665 (5th Cir.1975); McCarthy, *Trademarks and Unfair Competition* § 257 (2d ed. 1984).

■ For these reasons, a licensor that establishes infringing use and consumer confusion in a trademark suit brought against its former licensee has proved irreparable harm as a matter of law.

B. *Probability of Success*

■ Having found irreparable harm, a court must make a separate and distinct finding that plaintiff has established a probability of success on the merits. Although the district court made no explicit finding that appellants were likely to prevail on the merits, it did find and the record revealed that defendants continue to use

the identical registered trademarks that they had previously licensed. Defendants raise the defense that the signed transfer of rights by L. Ron Hubbard to RTC was forged and thus invalid. This assertion is unsupported by any credible evidence. Because the Church has made an unrebutted case that it owns the Scientology trademarks, plaintiffs are likely to prevail on their claim for trademark infringement. Moreover, the district court's finding of confusion in this case is additional evidence that strongly supports our determination that plaintiffs have established a probability of success on the merits. *See Standard & Poor's Corp.*, 683 F.2d at 708. Since both irreparable harm and likelihood of success have been satisfied, the injunction should issue.

### III  Findings of Fact

If defendants' use of the Scientology Trademarks posed a risk of diverting business from appellants by misleading the consumer, the district court said it would find irreparable harm in the economic injury this diversion would cause. But, the court believed the risk of lost business was not present because the parties are not in direct economic competition with one another; no other Scientology Mission had been established within 150 miles of Elmira. Because irreparable harm was established as a matter of law without examining whether defendants are in direct economic competition with plaintiffs, we need not decide this issue. Nevertheless, the district court's factual findings are highly questionable.

Although recognizing that an injunction should issue if there is any probability that a trademark holder desires to expand into the area where defendant operates, see *Foxtrap, Inc. v. Foxtrap, Inc.*, 671 F.2d 636, 640 (D.C.Cir.1982); *Dawn Donuts Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 362 (2d Cir.1959), the district court found no evidence of appellants' planned expansion into Elmira to compete with defendants. "All of the evidence presented to this Court indicates that the impact of the Elmira Mission's activities is entirely con-fined to an area where the plaintiffs have had no competing business interests at all." Such finding is certainly suspect.

This proposition may be valid where the trademark owner has no prior entry—and thus has done nothing to create a reputation—in the relevant market. But here the district court ignored the fact that the Scientology Church, as licensor to the Elmira Mission, has demonstrated a strong interest in maintaining its presence in the Elmira area. Evidence of this fact is the license it granted to defendants since 1972 to be *its* authorized licensee in that area. Until defendants renounced their agreement with appellants, *they* acted as the Scientology Church's presence in Elmira. Appellants appear to desire to be present in the Elmira area where there is a demonstrated interest in their teachings. Now that Palmer has breached his agreement and moved outside the Church, this area falls within appellants' area of natural expansion. *National Lampoon, Inc. v. American Broadcasting Cos., Inc.*, 376 F.Supp. 733, 747 (S.D.N.Y.), *aff'd*, 497 F.2d 1343 (2d Cir.1974). Once a licensor authorizes a licensee to use the mark in a particular area, he has demonstrated his desire to expand into that area, and when his licensee loses that authorization, he should not have to prove its intention to re-erect a *new* presence in the area. Thus, defendants present a risk of diverting business from appellants by misleading consumers into thinking the Elmira mission is authorized by the Scientology Church. *Foxtrap, Inc.*, 671 F.2d at 640 ("Under the Lanham Act, a federal registrant is entitled to enjoin a remote junior user of the mark if there is a likelihood of the registrant's entry into the disputed area.").

### IV

Accordingly, we reverse the order denying a preliminary injunction and remand the matter to the district court with a direction to it to issue the preliminary injunction pending trial.